```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/23/2025
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARK RUBENSTEIN,

                Plaintiff,

-against-

KOICHI ISHIZUKA, et al.,

                Defendants.

23-CV-04332 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

This is a shareholder derivative action seeking disgorgement of all "short-swing" profits that the defendants allegedly realized in violation of Section 16(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78p(b) ("Section 16(b)"). Defendants have moved to dismiss the First Amended Complaint in its entirety. For the reasons set forth below, the motion to dismiss is GRANTED.

## FACTS AND PROCEDURAL HISTORY

Plaintiff Mark Rubenstein commenced this action by filing a Complaint on May 24, 2023. Dkt. No. 1. On July 28, 2023, he filed the First Amended Complaint, clarifying information about the identities of the defendants and about the extraterritorial application of Section 16(b) to this action. Dkt. No. 17 ("First Amended Complaint" or "FAC"). The First Amended Complaint makes the following allegations, which are presumed true for purposes of this motion.[1]

Plaintiff is a resident of Rhode Island and a shareholder of Next Meats Holdings, Inc. ("Next Meats"). *Id.* ¶ 10. Defendant Koichi Ishizuka is a Japanese citizen and the Chief

---

[1] The Court shall refer to the parties' memoranda of law in support of and in opposition to Defendants' motion to dismiss as follows: Dkt. No. 26-1 ("Mot."), Dkt. No. 28 ("Opp."), Dkt. No. 30 ("Reply").

Executive Officer ("CEO") of Next Meats. *Id.* ¶ 3; Dkt. No. 26-3 (Affidavit of Koichi Ishizuka). Defendant White Knight Co., Ltd. ("White Knight") is a Japanese entity owned and controlled by Defendant Ishizuka. FAC ¶ 13; *see also id.* Ex. 4 (White Knight SEC Form 4 filing dated Jan. 4, 2023). Collectively, Defendants are the beneficial owners of more than 10% of the common stock of Next Meats, which is a nominal defendant.[2] *Id.* ¶ 3. This action was brought for the benefit of Next Meats, which is a Nevada corporation with its principal offices in Tokyo, Japan. *Id.* ¶ 11.

Next Meats is registered with the U.S. Securities and Exchange Commission (the "SEC"); the company's securities trade over-the-counter ("OTC") under the stock symbol NXMH, including through market-makers in this District. *Id.* ¶¶ 8, 14. The company manufactures vegetarian "meat" products, and its products are sold in retail stores and restaurants in the United States. *Id.* ¶ 6. As CEO, Ishizuka oversees all of Next Meats' operations. *Id.* ¶ 7.

On May 24, 2022, White Knight sold a total of 461,714 shares of Next Meats' restricted common stock to Pikul Co., Ltd., a Japanese company not related to Next Meats, for $0.85 per share. *Id.* ¶ 18; *id.* Ex. 3 (White Knight SEC Form 4 filing dated June 1, 2022).

On November 22, 2022, White Knight purchased 8,229,451 shares of Next Meats' restricted common stock at a price of $0.001 per share from Ryo Shirai, who was formerly the CEO and Chairman of the Board of Directors of Next Meats until his resignation in December 2021. *Id.* ¶ 19; *id.* Ex. 4. Also on November 22, White Knight purchased 112,863,282 shares of Next Meats' restricted common stock at a price of $0.001 per share from Hideyuki Sasaki, who

---

[2] A practice has developed in Section 16(b) cases wherein the issuer is listed as a nominal defendant in order to ensure that it, as the sole beneficiary of the action, is aware of the proceedings. The issuer is a defendant in name only. *See* PETER J. ROMEO & ALAN L. DYE, SECTION 16 TREATISE AND REPORTING GUIDE § 9.03[1][a][i] (6th ed. 2024).

was the Chief Operating Officer and a director of Next Meats at the time of the transaction. *Id.* ¶ 19; *id.* Ex. 4.

Following these transactions, White Knight was the majority controlling shareholder of Next Meats. *Id.* Ex. 4. Plaintiff does not allege that those transactions occurred in the United States. *See id.* After Defendants' Form 4 filings with the SEC in connection with those transactions, on January 4, 2023, Plaintiff's counsel made a demand on Next Meats to prosecute Defendants under Section 16(b) of the Exchange Act. *Id.* ¶ 16; *id.* Ex. 1. On February 22, 2023,[3] Defendants' counsel responded, disputing that the transactions violated Section 16(b). *Id.* ¶ 16; *id.* Ex. 2.

In this action, Plaintiff alleges that Defendants are "statutory insiders" of Next Meats who realized short-swing profits of approximately $391,995 from the sales and purchases described above in violation of Section 16(b). *Id.* ¶¶ 3, 23–25. Plaintiff also alleges that profits are recoverable from any additional sales and purchases or purchases and sales that Defendants made of Next Meats equity securities or equity security equivalents during periods not barred by the statute of limitations and within periods of less than six months of each other. *Id.* ¶¶ 26–28.

Defendants, including Next Meats, have moved to dismiss the First Amended Complaint, arguing that applying Section 16(b) to the alleged facts would constitute an impermissible extraterritorial application of the statute, that there is no basis for personal jurisdiction, and that venue is improper. *See* Dkt. No. 26. On April 16, 2024, the Court held oral argument on Defendants' motion.[4]

---

[3] The letter-response indicates that it is dated February 22, 2022, which appears to be an inadvertent error.

[4] Citations to the transcript of the oral argument shall be "Tr. [pincite]."

## LEGAL STANDARDS OF REVIEW

### I. RULE 12(B)(6) MOTION TO DISMISS

The question of whether a plaintiff's claims are sufficiently within the reach of Section 16(b) is a merits question that is properly considered on a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254 (2010). As such, even though Defendants appear to argue that the First Amended Complaint should be dismissed on extraterritoriality grounds due to improper venue, this Court properly assesses the extraterritoriality argument as one made under a motion under Rule 12(b)(6). *See id.*

In order to survive such a motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim only has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief[.]" *Bell Atl. Corp.*, 550 U.S. at 558. When ruling on a Rule 12(b)(6) motion, the district court must accept all factual allegations contained in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g., Koch v. Christie's Int'l, PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, courts are not required to accept as true legal conclusions, and "[t]hreadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678.

In assessing the sufficiency of the complaint, the court may also consider documents incorporated into the complaint by reference or attached to the complaint as exhibits, or whose terms and effect are relied upon by the plaintiff in drafting the complaint. *See Gryl ex rel. Shire*

4

*Pharms. Grp. PLC v. Shire Pharms. Grp. PLC*, 298 F.3d 136, 140 (2d Cir. 2002), *cert. denied*, 537 U.S. 1191 (2003). The court may also consider legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which the plaintiff relied in bringing the suit. *Goldstein v. QVT Assocs. GP LLC*, No. 10-CV-02488 (HB), 2010 WL 4058157, at *2 (S.D.N.Y. Oct. 15, 2010) (citing *ATSI Commc'ns v. Shaar Funds, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) and *In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366, 372 (S.D.N.Y. 2009), *aff'd*, 592 F.3d 347 (2d Cir. 2010)). Facts that appear in a party's brief but that were not alleged in the complaint or found in any documents properly before the court are not considered. *See In re iAnthus Cap. Holdings, Inc. Sec. Litig.* ("*iAnthus*"), No. 20-CV-03135 (LAK), 2021 WL 3863372, at *5 (S.D.N.Y. Aug. 30, 2021).

## II.  RULE 12(B)(2) AND 12(B)(3) MOTIONS TO DISMISS

On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure, a plaintiff must "make a prima facie showing that jurisdiction exists." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012) (internal references omitted). This showing must include an "averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Id.* (internal references omitted). The plaintiff's averment of jurisdictional facts is credited as true. *See In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003).

The standard for a motion to dismiss for improper venue is the same as the standard for a 12(b)(2) motion. *See Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005). The plaintiff bears the burden of showing that venue is proper. *See Avalon Holdings Corp. v. Gentile*, Nos. 18-CV-07291 (VSB), 18-CV-08896 (VSB), 2019 WL 4640206, at *3 (S.D.N.Y. Sept. 24, 2019).

5

# DISCUSSION

Section 16(b) of the Exchange Act is a strict liability statute that requires statutory "insiders" of an issuer—officers, directors, or certain beneficial owners—to disgorge short-swing profits regardless of their intent when trading. *Credit Suisse Sec. (USA) LLC v. Simmonds*, 566 U.S. 221, 223 (2012). Under the statute, short-swing profits are profits derived by an insider from the purchase and sale, or sale and purchase, of the issuer's securities within any six-month period. *Id.* The statute states, in relevant part:

> For the purpose of preventing the unfair use of information which may have been obtained by [a corporate insider] by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of [the insider].

15 U.S.C. § 78p(b).

The statute is intended to prevent corporate insiders "from engaging in speculative transactions on the basis of information not available to others." *Donoghue v. Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 173–74 (2d Cir. 2012) (internal references omitted).

## I.   EXTRATERRITORIAL APPLICATION

Defendant argues that applying Section 16(b) to the transactions at issue would be impermissibly extraterritorial. *See* Mot. at 5–7; Reply 3–7. The Court agrees.

Unless Congress has clearly expressed an affirmative intention that a statute has extraterritorial effect, courts must presume that the statute is primarily concerned with domestic conditions. *Morrison*, 561 U.S. at 255. No court has expressly held whether Section 16(b) applies extraterritorially. *See Rubenstein v. Cosmos Holdings, Inc.* ("*Cosmos*"), No. 19-CV-06976 (KPF), 2020 WL 3893347, at *10 (S.D.N.Y. July 10, 2020). However, courts in this District have looked to *Morrison* in interpreting the presumption against extraterritoriality with

6

respect to other sections of the Exchange Act, including Section 16(b). *See, e.g., id.* at *10–11; *Canoo Inc. v. DD Glob. Holdings, Ltd.* ("*Canoo*"), No. 22-CV-03747 (MKV), 2023 WL 6162296, at *4–6 (S.D.N.Y. Sept. 21, 2023).

In *Morrison*, in which the Supreme Court applied the presumption against extraterritoriality to Section 10(b) of the Exchange Act, the Court set out a "transactional test," holding that the Exchange Act applies only where "the purchase or sale is made in the United States" or where the transaction involves "a security listed on a domestic exchange." *Morrison*, 561 U.S. at 269–70. This test requires that at least one prong be satisfied: either the claim is "predicated on a purchase or sale of a security listed on a domestic exchange *or* on a domestic purchase or sale of another security." *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 200–01 (2d Cir. 2014) (emphasis added); *see also Cosmos*, 2020 WL 3893347, at *10.

Here, Plaintiff alleges that "[a]t all relevant times, the common stock of Next Meats traded over-the-counter under stock symbol NXMH, on exchanges or through market-makers located within this District." FAC ¶ 8. Defendants argue that because Next Meats is traded OTC and not on a domestic exchange, the issuer's securities are not traded on a domestic exchange for the purposes of *Morrison*'s first prong. Mot. at 6. Defendants also argue that the parties to the transactions at issue incurred irrevocable liability in Japan, so the transactions did not "occur" in the United States under *Morrison*'s second prong. *Id.* at 5–7; Reply at 3–7.

A.  *Morrison*'s First Prong: "Domestic Exchange"

Plaintiff alleges in the FAC that Next Meats was, at all relevant times, "traded over-the-counter under stock symbol NXMH, on exchanges or through market-makers located within this District," FAC ¶ 8, and that Next Meats' common stock "is listed on a domestic securities exchange," *id.* ¶ 9. However, in their briefs in support of their motion to dismiss, Defendants

7

assert that Next Meats is quoted on the Pink Sheets (*i.e.*, the OTC market) and its securities are not traded on any exchange. Mot. at 6; Reply at 4–5. Plaintiff does not dispute these facts, but argues that securities trading only OTC in the United States are traded on "a domestic exchange" for the purposes of *Morrison*'s first prong. *See* Opp. at 13–15.

Although facts argued only in the parties' briefs are not properly before the Court on a Rule 12(b)(6) motion, this Court may consider Next Meats' 2023 Form S-1 filed with the SEC, *see* Next Meats Holdings, Inc., Current Report (Form S-1) (May 24, 2023) ("Next Meats Form S-1"), which makes clear that "[t]he common stock of Next Meats Holdings, Inc. is quoted on the OTC Markets Group Inc.'s Pink® Open Market . . . under the symbol NXMH." *See Goldstein*, 2010 WL 4058157, at *2 (on a motion to dismiss, courts may consider legally required public disclosure documents filed with the SEC). This public filing contradicts the allegations in the First Amended Complaint that Next Meats securities trade or are listed on domestic securities exchanges, and indeed Plaintiff appears to abandon those allegations in his opposition brief. As such, this Court will consider that Next Meats' securities are traded OTC.

By definition, securities that trade OTC are not traded on a securities exchange. *See In re Petrobras Sec. Litig.*, 150 F. Supp. 3d 337, 340 (S.D.N.Y. 2015) (citing BLACK'S LAW DICTIONARY 1279 (10th ed. 2014)). For over a decade, courts in the Second Circuit have consistently found that the OTC market is not a domestic exchange for the purposes of *Morrison*'s first prong. *See, e.g., In re Petrobras Sec.*, 862 F.3d 250, 262 (2d Cir. 2017) (debt securities that were traded OTC do not satisfy *Morrison*'s first prong, because they "do not trade on a domestic exchange"); *iAnthus*, 2021 WL 3863372, at *2–3 (Canadian corporation with shares listed on the Canadian Stock Exchange and traded OTC in the United States did not trade on a "domestic exchange" within the meaning of the Exchange Act and its implementing

regulations); *In re Poseidon Concepts Sec. Litig.*, No. 13-CV-01213 (DLC), 2016 WL 3017395, at *12 (S.D.N.Y. May 24, 2016) ("The Third Circuit has held that OTC markets are not domestic securities exchanges under *Morrison*. . . . The Third Circuit's logic is compelling, as OTC Pink Sheets is a quotation service that certain broker-dealers use to post offers to sell and to buy securities not listed on a national exchange, and is not itself an exchange.") (internal references omitted) (citing *United States v. Georgiou*, 777 F.3d 125, 135 (3d Cir. 2015) and *S.E.C. v. Boock*, No. 09-CV-08261 (DLC), 2011 WL 3792819, at *18 (S.D.N.Y. Aug. 25, 2011)); *In re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449, 457 (S.D.N.Y. 2013) (where the issuer's shares were traded on a European exchange and sometimes traded in OTC transactions in the United States, the shares were not traded on a domestic exchange); *see also Stoyas v. Toshiba Corp.*, 896 F.3d 933, 945–47 (9th Cir. 2018) (holding that the OTC securities market in question was not an exchange and thus could not be classified as a "domestic exchange" under *Morrison*'s first prong).[5]

As such, *Morrison*'s first prong is not satisfied here because Next Meats is only quoted or traded OTC, and is not listed or traded on any domestic exchange. *See* Next Meats Form S-1.

## B.   *Morrison*'s Second Prong: Domestic Transaction

Although the first prong of *Morrison* is not satisfied here, Section 16(b) may still apply extraterritorially if *Morrison*'s second prong—domestic transactions in securities not traded on a domestic exchange—is met. The natural next question is: how do you determine where a transaction "takes place" if the transaction may require multiple steps to become final?

---

[5] Plaintiff cites *Cosmos* and *Canoo* to support his contention that the inclusion of Next Meats' securities on the domestic OTC market satisfies *Morrison*'s first prong. Opp. at 13–15. *Cosmos* does not support this contention. In that case, the defendants had not argued that the plaintiff failed to adequately allege that the securities were traded on a domestic exchange; the court "decline[d] to make arguments for dismissal that [the defendants] chose not to present." 2020 WL 3893347, at *11. *Canoo* involved securities listed on the NASDAQ and thus has no bearing on the question of whether OTC trading is on a "domestic exchange." 2023 WL 6162296, at *4–5. Plaintiff admitted at oral argument that Plaintiff is not aware of any other authority from this Circuit that holds that OTC markets are domestic exchanges under *Morrison*. Tr. 10–12. Nor is the Court.

The Second Circuit has held that a transaction is "domestic" under *Morrison* if (1) the parties incurred "irrevocable liability" in the United States—"that is, that the purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security"—or (2) title was transferred in the United States. *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68–69 (2d Cir. 2012). In determining whether a securities transaction is domestic under this test, courts do not look to the identity of the parties, the type of security at issue, or whether the defendant engaged in conduct in the United States. *Id.* at 69. Rather, courts look to whether the plaintiff alleged specific "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money[.]" *Id.* at 70. Without such facts, "the mere assertion that transactions 'took place in the United States' is insufficient to adequately plead the existence of domestic transactions." *Id.*

Defendants focus mostly on the irrevocable liability test in their briefing papers, *see* Mot. at 5–7, Reply at 3–7, whereas Plaintiff focuses on the transfer of title, Opp. at 3–4, 15–17, but the second prong of *Morrison* is satisfied if either test is met. *See Absolute Activist*, 677 F.3d at 68–69; *Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018).

1. **Irrevocable Liability**

The Exchange Act provides that "unless the context otherwise requires," the terms "buy" and "purchase" both "include any contract to buy, purchase, or otherwise acquire." 15 U.S.C. § 78c(a)(13). Generally speaking, "a stock is purchased within the meaning of Section 16(b) when the investor becomes irrevocably committed to the transaction and, in addition, no longer has control over the transaction in any way that could be turned to speculative advantage by the investor." *Cosmos*, 2020 WL 3893347, at *6 (internal references omitted); *see also Prager v. Sylvestri*, 449 F. Supp. 425, 432–33 (S.D.N.Y. 1978) (defendant "purchased" stock when he

tendered the full consideration for the stock because defendant's purchase became "irrevocable," even though the number of shares due to him was at the time unknown and even though the defendant did not receive the stock until a later date); *Williams v. Binance,* 96 F.4th 129, 136 (2d Cir. 2024) (Irrevocable liability "attaches when the parties to the transaction are committed to one another, or when in the classic contractual sense, there was a meeting of the minds of the parties." (internal references omitted)).

In determining whether irrevocable liability was incurred in the United States, courts look to the "terms, timing, and place of the parties' contracting and liabilities thereunder." *Giunta,* 893 F.3d at 79 (internal references omitted). Technicalities of stock transfers alone are "of no import for Section 16(b) purposes." *Cosmos,* 2020 WL 3893347, at *6 (citing *Prager,* 449 F. Supp. at 433); *see also Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 254 n.28 ("[T]he crucial point in the acquisition of securities is not the technical 'purchase,' but rather the decision to make an acquisition.").

Plaintiff has not alleged *any* facts in the First Amended Complaint supporting a plausible inference that Defendants incurred irrevocable liability in the United States. Nor did Plaintiff make any arguments in its briefing to the effect that irrevocable liability was incurred domestically. It appears undisputed that all contractual steps for the transactions at issue, and thus the point of irrevocable liability, took place in Japan. Accordingly, Plaintiff cannot satisfy *Morrison*'s second prong under this test.

### 2. Transfer of Title

"[A] sale of securities can [also] be understood to take place at the location in which title is transferred." *Absolute Activist,* 677 F.3d at 68 (citing BLACK'S LAW DICTIONARY 1454 (9th ed. 2009) and U.C.C. § 2-106(1)). In *Quail Cruise Ship Management Ltd. v. Agencia de Viagens CVC Tur Limitada,* the Eleventh Circuit found that the plaintiff plausibly alleged that transfer of

11

title of the stocks at issue occurred in the United States when the parties submitted stock transfer documents in the United States; in that case, the operative share purchase agreement required stock transfer documents to be delivered to an office in Florida, and it was not until this domestic closing that title to the shares was deemed transferred under the contract. 645 F.3d 1307, 1310–11 (11th Cir. 2011).

The mere delivery of share certificates, however, does not necessarily mark the moment or locus of the transfer of title. In *Cosmos*, the court found that the purchaser had purchased stock at the time she had executed a purchase agreement and paid for the stock; "[t]here was nothing else [the purchaser] needed to do to complete the purchase" because "she had lost the power to refuse the purchased stocks and demand repayment," and "[a]ny condition relating to delivery of the shares did not affect [her] rights and obligations[.]" 2020 WL 3893347, at *6; *see also Donoghue v. Local.com Corp.*, No. 07-CV-08550 (LBS), 2009 WL 260797, at *3 (S.D.N.Y. Feb. 3, 2009) ("[O]wnership of a security does not turn on the possession of a share certificate because the issuance of a share certificate is merely an indicium of ownership. . . . [P]rivileges and rights of ownership are gained once the full consideration has been tendered for the security.") (internal citations omitted), *aff'd sub nom., Donoghue v. Hearst Commc'ns, Inc.*, 355 F. App'x 520 (2d Cir. 2009).

Here, the First Amended Complaint is devoid of any facts regarding the location of the transfer of title. Rather, the sole fact that could plausibly support a finding of a domestic transaction is that Next Meats' transfer agent has a mailing address in New Jersey. According to Defendants' Form 4 filings with respect to the relevant purchases of Next Meats' stock, the transfer of shares was "recorded by the Issuer's transfer agent on December 16, 2022." *See* FAC Ex. 4. In his opposition brief, Plaintiff also pointed to the Next Meats Form S-1 and noted that

Next Meats' transfer agent is Olde Monmouth Stock Transfer Co., Inc., which has a mailing address in New Jersey. *See* Opp. at 16. As such, Plaintiff argued that transfer of title to Defendants in connection with the relevant purchases occurred in the United States. *See id.*

A transfer agent is an entity, such as a bank or trust company, used by companies to "keep track of the individuals and entities that own their stocks and bonds." *Transfer Agents*, INVESTOR.GOV, www.investor.gov/introduction-investing/investing-basics/glossary/transfer-agents (last visited May 23, 2025). Transfer agents keep records of who owns the company's stocks and bonds and may issue certificates to reflect changes in ownership. *Id.* However, transfer agents are scriveners, and Plaintiff has offered no argument that notation in the records equates to transfer of title.[6] The mere recording of the transaction by the issuer's transfer agent in the United States is a technicality that is insufficient to satisfy *Morrison*'s second prong. *See Cosmos*, 2020 WL 3893347, at *6. Plaintiff pleads no facts to suggest a U.S. location for any of the other identifiable steps in the relevant transactions, whether contract negotiations, entry into agreements related to the transactions, fulfillment of obligations necessary to the purchase or sale, or transfer of funds. Indeed, it appears undisputed that all of these events took place in Japan. The mere fact that the subsequent recording of the purchase may have occurred in the United States[7] does not determine the location of the transfer of title. *See id.* Much like the issuance of a share certificate, recording in the books and records is merely indicia of ownership, not the acquisition of ownership itself. *See Donoghue*, 2009 WL 260797, at *3.

---

[6] One could imagine, similar to that in *Quail Cruise Ship*, a contractual provision expressly conditioning a sale on the recording of such in the books of the company's transfer agent. Such a provision would potentially bear on the analysis of where the sale "took place" or where transfer of title was effectuated. But no such provision is alleged here.

[7] Moreover, the only fact pled on the location of recording is that the transfer agent's mailing address is in New Jersey.

13

Plaintiff suggested during oral argument that the recording of the transaction is needed to close the transaction (but offered no evidence or citation to support this) and that the recording by the transfer agent is evidence that the transaction occurred. *See* Tr. 15–16. Even if this were all true, administrative technicalities, or steps that could serve as indicia of ownership, do not constitute the transaction itself. Indeed, Plaintiff conceded that the recording by the transfer agent does not govern when the transaction occurred. *Id.* 17.

Notably, in the context of irrevocable liability, the Second Circuit has distinguished between acts needed to carry out a transaction and the transaction itself. *Loginovskaya v. Batratchenko*, 764 F.3d 266, 274–75 (2d Cir. 2014). In *In re Petrobras Securities Litigation*, a court in this District assessed that holding in the context of the transfer of title to debt securities. 150 F. Supp. 3d at 341–42. The plaintiffs in that case had alleged that title transferred in the United States because their purchases of debt securities settled through the Depository Trust Company ("DTC") in New York. *Id.* at 341. The DTC facilitated the settlement of transactions between participants through electronic book entry changes to the accounts of its participants. *Id.* at 342. The DTC held legal title to the securities, but the investors held beneficial title. *Id.* The plaintiffs argued that when the DTC adjusts its books to settle an investor's trade, this is the equivalent of the transfer of title. *Id.* The court acknowledged that "global financial markets could not properly function without the DTC or similar depository institutions and that the chain reaction of the adjustments to book entries set off by a securities transaction is necessary to complete a purchase." *Id.* However, the court noted that even assuming the DTC's bookkeeping affects a change in beneficial ownership in New York, "the Second Circuit has . . . indicated that domestic actions needed to carry out transactions, and not the transactions themselves, are insufficient to satisfy *Morrison*. The mechanics of DTC settlement are actions needed to carry

14

out transactions, but they involve neither the substantive indicia of a contractual commitment necessary to satisfy *Absolute Activist*'s first prong nor the formal weight of a transfer of title necessary for its second." *Id.* (internal references omitted) (citing *Loginovskaya*, 764 F.3d at 275). "[T]he entire thrust of *Morrison* and its progeny would be rendered nugatory if all DTC-settled transactions necessarily fell under the reach of the federal securities laws. The laws would reach most transactions, not because they occurred on a domestic exchange but because they settled through the DTC. This result cannot be squared with the plain language and careful reasoning of *Morrison* and *Absolute Activist*." *Id.* In this case, even if the recording of the transactions by the transfer agent were necessary to effectuate the transaction at issue—which is not at all clear—domestic recordings of transactions are not themselves transactions and are thus insufficient to satisfy *Morrison*.

Plaintiff appeared to make the policy argument during oral argument that the claims are not impermissibly extraterritorial because of the general presence of Next Meats' products in U.S. markets and the registration of Next Meats as a Nevada corporation, arguing that the stock transactions at issue thus touch upon U.S. instrumentalities and entities in some way. Tr. 15–18. Whatever the persuasiveness of such a policy argument may be, this Court need not engage with this argument because the law in this Circuit looks to the location of irrevocable liability or of the transfer of title in assessing *Morrison*'s second prong in connection with enforcement of the securities laws.

In short, Plaintiff does not plausibly allege that the transfer of title occurred in the United States, and thus Plaintiff has failed to satisfy either prong under *Morrison*'s test for extraterritorial application. The motion to dismiss is granted for failure to state a claim upon which relief can be granted.

## II.   PERSONAL JURISDICTION

Because Plaintiff has failed to state a claim and the FAC will be dismissed on that basis, this Court need not address at length the motion to dismiss for lack of personal jurisdiction and venue. However, the Court has properly addressed the 12(b)(6) motion because Plaintiff has established the Court has personal jurisdiction over both Defendants.

The Exchange Act permits the exercise of personal jurisdiction to the limits of the Due Process Clause of the Fifth Amendment. *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990). The Due Process test has two components: (1) the defendant must have sufficient minimum contacts with the forum to merit jurisdiction; and (2) defendant must reasonably be expected to defend a claim in the forum. *See Donoghue v. Dicut, Inc.*, No. 01-CV-10194 (NRB), 2002 WL 1728539, at *1 (S.D.N.Y. July 24, 2002). As Defendant conceded at oral argument, the relevant forum for this inquiry is the entire United States. *See* Tr. 6–7.

Plaintiff has met his *prima facie* burden of demonstrating personal jurisdiction. Next Meats is a U.S. corporation and, as Defendants conceded at oral argument, the company's products are available in retail locations in the United States. FAC ¶ 6; *see* Tr. 7–8. As Defendants further conceded at oral argument, Next Meats' securities are registered with the SEC and traded OTC in the United States, and it is generally subject to SEC regulations and has routinely made required SEC filings. FAC ¶¶ 8, 14; *see* Tr. 7. Defendant Ishizuka is an executive of Next Meats, and the Defendants are corporate insiders who traded in the company's securities. FAC ¶ 3. Moreover, some of Next Meats' securities are owned by U.S. shareholders, including Plaintiff. *Id.* ¶ 10.

Thus, although the transactions at issue did not occur in the United States and were private transactions, Plaintiff has shown that the transactions can reasonably be expected to

impact U.S. shareholders and that Defendants have sufficient minimum contacts with the United States to fall within the limits of due process. *See Dicut*, 2002 WL 1728539, at *2 (foreign defendant who conducted transactions through Canadian brokerage houses was subject to personal jurisdiction in the United States because the issuer was a U.S. company, the defendant was a director of the issuer, the issuer's securities were registered with the SEC and traded OTC, and some of its securities were owned by U.S. citizens, including the plaintiff); *Canoo*, 2023 WL 6162296, at *3 (with respect to private transactions conducted overseas, the defendant had sufficient minimum contacts with the United States because the issuer was a U.S.-based company with shares traded on the NASDAQ, so the alleged conduct "could reasonably have been expected to have adverse effects on United States shareholders of [the company]").

Nor have Defendants met their burden of showing that the Court's exercise of personal jurisdiction over them would be unreasonable. *See Dicut*, 2002 WL 1728539, at *2. The reasonableness inquiry is "largely academic" in this case, where "strong federal interests" in a case brought under the Exchange Act outweighs other burdens. *See Donoghue v. Ghauri*, No. 14-CV-06383 (PAC), 2015 WL 3919120, at *4 (S.D.N.Y. June 25, 2015) (internal references omitted). Defendants have failed to convincingly articulate that the exercise of personal jurisdiction here would be unreasonable. Similarly, Plaintiffs have adequately pled that Next Meats "transacts business" in New York, and thus venue lies here under the Exchange Act. 15 U.S.C. § 78aa(a); *see* FAC ¶¶ 6, 8, 10, 14.

\* \* \*

## CONCLUSION

For all of the foregoing reasons, Defendants' motion to dismiss the First Amended Complaint is GRANTED under Rule 12(b)(6) for failure to state a claim on which relief can be granted. The Clerk of Court is respectfully directed to CLOSE this case.

Dated: May 23, 2025
      New York, New York

SO ORDERED.

_____
MARGARET M. GARNETT
United States District Judge